**[Cite as *Rodriguez v. Catholic Charities Corp.*, 2025-Ohio-4840.]**

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

MICHELLE RODRIGUEZ, : 
ADMINISTRATRIX,

      Plaintiff-Appellant,     :

                           No. 114437

      v.                   :

CATHOLIC CHARITIES
CORPORATION, ET AL.,       :

      Defendants-Appellees.    :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** October 23, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-19-909566

---

### *Appearances:*

Deratany & Kosner, Jay Paul Deratany and Thomas Stewart; Randazzo Law, L.L.C. and Russell A. Randazzo; Davis & Young, Matthew Baringer and Dennis R. Fogarty; Flowers & Grube and Paul W. Flowers, *for appellant*.

Hupp Margolis & Leak LLC and Douglas G. Leak; Lewis Brisbois Bisgaard & Smith LLP, Thomas P. Mannion and Theresa A. Edwards; Weston Hurd LLP and Beth A. Sebaugh, *for appellees*.

EILEEN A. GALLAGHER, A.J.:

{¶ 1} Michelle Rodriguez, as the administrator of Jordan Rodriguez's ("Jordan") estate (the "Estate"), appeals the jury verdict finding Catholic Charities Corporation and Catholic Charities Diocese of Cleveland (collectively "Catholic Charities") liable for negligent hiring, supervision and training of its employee Nancy Caraballo ("Caraballo"). For the following reasons, we reverse the court's judgment and remand this case for a new trial.

{¶ 2} In December 2017, Cleveland police responded to a call of "remains found" and discovered Jordan's body buried in the backyard of the house in which he lived with his mother Larissa Rodriguez ("Larissa"), Larissa's boyfriend, Christopher Rodriguez ("Christopher"), and several of his siblings. The Cuyahoga County Medical Examiner's Office determined that Jordan died in September 2017, as a result of "homicide by unspecified means." According to the autopsy report, a more "definitive" cause of death could not be determined because the examination was "markedly compromised by advanced postmortem change." The autopsy report also stated that "evidence present is consistent with past inflicted injuries" to Jordan, including a broken arm and several broken ribs. Jordan, who had numerous physical challenges and developmental disabilities, including having only one functioning kidney and being nonverbal, was four years and ten months old when he died.

{¶ 3} In April 2018, Caraballo, who, as a Catholic Charities employee, had been providing parenting education services to Larissa's family, pled guilty to food-

stamp trafficking, grand theft and tampering with records in conjunction with Larissa. According to evidence in the record, Caraballo had been buying Larissa's food stamps for 50 cents on the dollar for at least two years prior to Jordan's death. The court sentenced Caraballo to 36 months in prison. *See State v. Caraballo*, Cuyahoga C.P. No. CR-18-625508-A.

{¶ 4} On June 29, 2018, Larissa pled guilty to involuntary manslaughter and other offenses in relation to Jordan's death. *See State v. Rodriguez*, Cuyahoga C.P. No. CR-18-625525-A. Larissa also pled guilty to food-stamp trafficking, telecommunications fraud, grand theft and money laundering in conjunction with Caraballo. The court sentenced Larissa to 25 years in prison. *See State v. Rodriguez*, Cuyahoga C.P. No. CR-18-625508-B.

{¶ 5} On June 29, 2018, Christopher pled guilty to involuntary manslaughter and other offenses in relation to Jordan's death. The court sentenced Christopher to 28 years in prison. *See State v. Rodriguez*, Cuyahoga C.P. No. CR-18-625525-B. Christopher appealed his sentence, and this court affirmed. *See State v. Rodriguez*, 2019-Ohio-1532 (8th Dist.).

## I. Procedural History

{¶ 6} On January 15, 2019, the Estate filed a complaint against Catholic Charities, Larissa, Christopher and Caraballo. The complaint alleged wrongful death and other claims associated with Jordan's death. On January 6, 2020, the Estate filed an amended complaint and added several defendants to this case. On September 17, 2020, the Estate filed a second amended complaint, which narrowed

the defendants to Catholic Charities, Caraballo, Bright Beginnings and Porcia Mainor ("Mainor"). On April 20, 2021, the court granted Bright Beginnings' summary-judgment motion, and on September 9, 2021, the court granted Mainor's summary-judgment motion.

{¶ 7} Relevant to this appeal, the second amended complaint alleged the following causes of action:

First Claim — "reckless, willful, and wanton" wrongful death against Catholic Charities and Caraballo;

Second Claim — "negligence" wrongful death against Catholic Charities and Caraballo;

Third Claim — "reckless, willful, and wanton and negligence" survival action against Catholic Charities;

Fourth Claim — "negligence" wrongful death against Caraballo;

Fifth Claim — "negligence" survival action against Caraballo;

Sixth Claim — statutory failure to report child abuse or neglect against Catholic Charities and Caraballo;

Seventh Claim — negligent failure to supervise Caraballo against Catholic Charities.

{¶ 8} Catholic Charities filed four motions for summary judgment concerning statutory immunity, contract-related claims, respondeat superior-related claims and negligent hiring, training and supervision claims. The court denied all of Catholic Charities' motions for summary judgment. Catholic Charities appealed the trial court's summary judgment ruling concerning statutory immunity, and this court affirmed, finding that Catholic Charities was not entitled to political

subdivision immunity under R.C. 2744.02. *See Rodriguez v. Catholic Charities Corp.*, 2022-Ohio-1317 (8th Dist.).

{¶ 9} In September 2021, the Estate and Caraballo entered into a settlement agreement.

{¶ 10} On December 19, 2022, the court issued three journal entries in this case after reviewing deposition testimony, including Caraballo's, affidavits and other documentary evidence. The court signed and filed a copy of the settlement agreement between the Estate and Caraballo, the court signed and filed a copy of a "consent judgment and stipulations as to certain facts" (the "CJE"), which essentially mirrored the settlement agreement, and the court issued a journal entry stating as follows:

> Hearing held on defendant . . . Caraballo's amended motion to enforce settlement. Said motion is granted. The settlement agreement between [the Estate] and Caraballo, which the parties thereto agree was entered into no later than 9-29-21, and the consent judgment agreed upon by [the Estate] and Caraballo will be entered separately. [The Estate's] claims against . . . Caraballo are dismissed with prejudice. [The Estate's] claims against Catholic Charities . . ., which arise in part based on Caraballo's actions, remain pending.

{¶ 11} The CJE disposed of the following claims in favor of the Estate and against Caraballo: claims one and two, to the extent they were brought against Caraballo; claims four and five in their entirety, because they were brought against Caraballo only and claim six, to the extent it was brought against Caraballo. Conversely, the following claims remained pending against Catholic Charities: Claims one and two, to the extent they were brought against Catholic Charities;

claim three in its entirety; claim six, to the extent it was brought against Catholic Charities and claim seven in its entirety. The remaining claims against Catholic Charities alleged the following:

- "Reckless, willful, and wanton" wrongful death

- "Negligence" wrongful death

- Survival action

- Failure to report child abuse and neglect

- Negligent hiring, training and supervision of Caraballo

{¶ 12} In the CJE, the court found that Caraballo failed to meet the standard of care required of Catholic Charities' employees in her position. The CJE further stated that it was an "entry of a civil judgment against . . . Caraballo" in the amount of $36 million "for the wrongful death of Jordan . . . ." The CJE additionally stated that the Estate "will not attempt to collect any portion of this judgement against . . . Caraballo . . ."

{¶ 13} Specifically, in the CJE, the court found, in part, the following:

"Jordan . . . was born with developmental issues and special needs, making him particularly vulnerable to nutritional deprivation and other forms of neglect and abuse."

Caraballo "acted as an employee and agent of Catholic Charities at all times that she was providing" services to Larissa's family, including Jordan.

As part of her job as a parent educator for Catholic Charities, Caraballo "was required to provide nutritional counseling" to Larissa and her family, including Jordan, and "was required to report abuse and neglect" of Larissa's children, including Jordan.

Jordan died "on or about September 22, 2017" of "nutritional neglect."

"In the 3-6 months leading up to Jordan['s] death, Jordan exhibited significant and recognizable signs of wasting" and "suffered abuse at [the] hands of . . . Larissa . . . and . . . Christopher . . . . inclusive of a fractured ulna and ribs."[1]

Caraballo "failed to meet the standard of care required of a social service worker [and] [p]arent [e]ducator for Catholic Charities when she failed to go to scheduled visits to" Larrisa's home, "when she failed to report abuse and neglect" in Larissa's home and "when she failed to provide adequate nutritional counseling" to Larissa's family.

{¶ 14} The remaining claims against Catholic Charities proceeded to a jury trial on March 25, 2024.  On April 23, 2024, the court issued a journal entry that reads in its entirety as follows:

Proceeding date 04/18/2024.  Trial continues.  Motions heard and ruled on the record.  The court grants and denies in-part.  Pursuant to Clawson, motion is granted as to counts four, five, and six.  Counts three and seven merge.  Regarding count one, count one will only reach the jury as a bifurcation issue post-verdict, if necessary.  Count two to merge with count seven.

Defendant rests, after exhibits are offered and admitted into evidence.  Defendant makes renewed motion for directed verdict.  Court reporter present.  Matter to resume 04/19/2024.  Notice issued.

{¶ 15} Although somewhat unclear from this journal entry, we glean that the court granted in part and denied in part Catholic's Charities' motion for directed verdict.  It is completely unclear from this journal entry what other motions were "heard and ruled on" not to mention what those rulings were.

---

[1] "Wasting is the most immediate, visible and life-threatening form of malnutrition.  It results from the failure to prevent malnutrition among the most vulnerable children." *Nutrition and care for children with wasting*, Unicef.org/nutrition/child-wasting (accessed Sept. 17, 2025) [https://perma.cc/JNH5-DZSG]

{¶ 16} A review of the transcript of the proceeding that took place on April 18, 2024, shows that Catholic Charities moved for a directed verdict based on the issue of vicarious liability. Specifically, Catholic Charities argued that, because all claims against Caraballo were "extinguished" when she was dismissed from this lawsuit in December 2019, pursuant to *Clawson v. Hts. Chiropractic Physicians, L.L.C.*, 2022-Ohio-4154, it could not be held liable as a matter of law for Caraballo's wrongdoing. Simply put, Catholic Charities argued that "the settlement with Nancy Caraballo destroys respondeat superior liability."

{¶ 17} In turn, the Estate argued that Caraballo's liability in this case was not extinguished because in the CJE, the court expressly found Caraballo liable for the death of Jordan. The Estate further argued that, in any event, claim seven was a direct liability cause of action, rather than a derivative liability cause of action, and a vicarious liability theory was not needed to hold Catholic Charities accountable for negligent hiring, training or supervision of Caraballo.

{¶ 18} At the April 18, 2024 proceeding, the court granted Catholic Charities' motion for directed verdict as to claims four, five and six. We note that claims four and five were not asserted against Catholic Charities. Rather, they were asserted against Caraballo only, and they were disposed of in favor of the Estate when the court issued the CJE on December 19, 2022.

{¶ 19} Also at the April 18, 2024 proceeding, the court found that claims two and three "merged" into claim seven.[2] The court did not rule on the motion for directed verdict as related to claim one, and the court denied the motion for directed verdict as to claim seven.

{¶ 20} After the directed verdict ruling, the court instructed the jury that this case was a civil action brought by the Estate against Catholic Charities alleging "negligent hiring, training, and/or supervision" of Caraballo and that this alleged negligence was a proximate cause of Jordan's death. The court also instructed the jury on the concepts of wrongful death damages and survival claim damages. Additionally, the court instructed the jury about mandatory reporting of child abuse despite the fact that it granted a directed verdict on claim six, which alleged the failure to report child abuse.

{¶ 21} The court further instructed the jury that "as a matter of law . . . Catholic Charities is not directly liable for the actions of . . . Caraballo regardless of whether those actions are within the course and scope of her employment or outside

---

[2] We are unaware of any Ohio law that allows for the "merger" of civil claims. Furthermore, even if there was such a thing as merger of civil claims, claims two and three in this case allege wrongful death and a survival action, respectively, both of which are independent causes of action. In *Everheart v. Coshocton Cty. Mem. Hosp.*, 2023-Ohio-4670, ¶ 27, the Ohio Supreme Court recognized that "wrongful-death claims are independent causes of action, not derivative actions." Indeed, wrongful death has its own statute, R.C. 2125.01, which is titled "Action for wrongful death." Additionally, in *Peters v. Columbus Steel Castings Co.*, 2007-Ohio-4787, ¶ 7, the Ohio Supreme Court stated that "a survival action brought to recover for a decedent's own injuries before his or her death is independent from a wrongful-death action . . . ."

the course and scope of employment." The court did not instruct the jury on the concept of vicarious liability.

{¶ 22} The court also reviewed with the jury the interrogatory and verdict forms that were to be submitted to them and which included whether the Estate proved that Catholic Charities was negligent in hiring, training and supervising Caraballo, whether this negligence was a proximate cause of Jordan's death, an apportionment of fault, and compensatory damages. We note that, as evidenced by these forms, the only cause of action for which the jury was instructed to render a verdict was negligent hiring, training and supervision.

{¶ 23} On April 23, 2024, the jury found in favor of the Estate and against Catholic Charities on the negligent hiring, training and supervision claim. The jury awarded the Estate $12 million in compensatory damages. The jury further attributed 8 percent of fault to Catholic Charities and the remaining fault as follows: Caraballo, 2 percent; Cuyahoga County Department of Children and Family Services ("CCDCFS") employees, 15 percent; MetroHealth Hospital ("MetroHealth") employees and/or independent contractors, 11 percent; Christopher, 12 percent and Larissa, 52 percent. Because there is no evidence in the record that CCDCFS, MetroHealth, Christopher or Larissa had a role in Catholic Charities' negligent hiring, training and supervision of Caraballo, and that was the only claim for which the jury was instructed to complete a verdict form, it is unclear under what legal theory, or theories, the jury found these nonparties partially liable for Jordan's death.

{¶ 24} The court issued a journal entry on April 24, 2024, stating that the jury returned a "verdict in favor of [the Estate] and against . . . Catholic Charities in the amount of $960,000," which is 8 percent of $12 million. The next day, Catholic Charities moved the court to apply the statutory cap on noneconomic damages, pursuant to R.C. 2315.08, to reduce the total monetary award from $12 million to $9,250,000 and reduce Catholic Charities' portion of this award from $960,000 to $740,000.

{¶ 25} On April 30, 2024, the punitive damages phase of the trial commenced and, on May 2, 2024, the jury returned a verdict in favor of Catholic Charities, declining to award the Estate punitive damages.

{¶ 26} On September 9, 2024, the court issued a journal entry agreeing with Catholic Charities on the damages-cap issue and reducing its portion of the damage award to $740,000.

{¶ 27} The Estate appeals and assigns the following errors for our review:

I. The common pleas court erred, and otherwise committed an abuse of discretion, to [the Estate's] considerable detriment by unjustifiably barring all expert opinion testimony on the issue of causation.

II. The entry of a directed verdict upon the claims of respondent superior liability was contrary to law.

III. The trial court's apportionment of damages was not justified by the record evidence and otherwise failed to comply with R.C. 2307.23(A) and the Ohio Constitution's guarantees of due process and a right to a remedy.

IV. A further error of law was committed when the trial court refused to apply principles of collateral estoppel and otherwise bind [Catholic

Charities] to the consent judgment and stipulations as to certain facts that had been entered by the court in December 2022.

V. The trial court committed clear error by allowing highly prejudicial hearsay rape allegations and false allegations of criminal conduct.

VI. As a result of the numerous prejudicial errors and abuses of discretion that were committed throughout the jury trial proceedings, a reversal and new trial is required under the cumulative error doctrine.

## II. Trial Testimony

{¶ 28} What follows is a summary of the testimony presented at trial that is relevant to this appeal. An exhaustive review of all testimony given at this weeks-long trial is unnecessary in this case, because the dispositive assignments of error challenge matters of law and procedural issues rather than facts.

{¶ 29} Caraballo met Larissa in 1997 when Caraballo was assigned to provide parenting services to Larissa through the Spanish American Committee, which, according to CCDCFS, is a community service provider that CCDCFS "put[s] in the home to provide services to improve the family's functioning, help delayed children, improve parenting skills things like that." Pursuant to R.C. 2151.421, employees of community service providers are mandatory reporters of child abuse and neglect if they "see something" in the home.

{¶ 30} Jordan was born four months prematurely on November 5, 2012, and had numerous physical challenges and developmental disabilities. Jordan spent the first 88 days of his life in the neonatal intensive care unit at MetroHealth.

{¶ 31} In 2013, after the Spanish American Committee's contract with CCDCFS ended, Catholic Charities contracted with CCDCFS to provide parenting

services to certain families, including Larissa's. Catholic Charities is also a community service provider that worked with CCDCFS. Catholic Charities hired Caraballo in July 2013 to work in its parents as teachers program as a parent educator.

{¶ 32} Larissa's family was one of the families to which Caraballo was assigned because "it made sense" to assign the case to Caraballo who had already worked with the family. Evidence established that Catholic Charities did not meet with Caraballo and Larissa's family "to do a brand new intake to talk about the relationship" between Caraballo and Larissa's family nor did Catholic Charities ask Caraballo about her relationship with Larissa.

{¶ 33} Larissa and her family were enrolled in various Catholic Charities programs beginning in July 2013. The programs promoted the "well-being of parents, children, and their families" and were designed to reach certain outcomes, including the "prevention of child abuse and neglect." The programs also included "nutritional counseling." Caraballo testified that Jordan "was part of the Rodriguez family" and her clients, or the people to whom she provided services, were "families." By this time, Caraballo had been providing services to Larissa and her children for 16 years.

{¶ 34} Caraballo's position as a parent educator at Catholic Charities required a "minimum of a Bachelor's degree or an Associate's degree with at least 60 hours of college credit with at least two years supervised work experience with young children and/or parents . . . ." Caraballo met the requirement of two-years of

supervised work experience, but she did not possess the educational requirements. Additionally, this position required applicants to be "certified as a service coordinator by the Ohio Department of Health." According to Caraballo, her supervisors at Catholic Charities never asked, or required, her to get this certification.

{¶ 35} As part of Catholic Charities' services, its employees were required to provide two home visits per month to the families who were enrolled. Caraballo, who testified at trial, admitted that she did not provide two home visits per month to Larissa's family. Nonetheless, Caraballo "submitted visit notes" to Catholic Charities in which she stated that she went to Larissa's home to provide services for times that she did not go to Larissa's home. Specifically, Caraballo did not appear at 43 out of 97 home visits for which she provided written reports. In other words, Caraballo submitted falsified records to Catholic Charities stating that she provided these visits to Larissa's family. Evidence showed that Caraballo "cut and pasted" the same observations regarding Larissa's family from one Catholic Charities form onto multiple other Catholic Charities forms. These observations included specific details that were unlikely to happen repeatedly, complete with identical errors.

{¶ 36} In short, Caraballo admitted that she did not perform her job regarding Larissa's family.

{¶ 37} The last time Caraballo "specifically recorded anything about Jordan's well-being" in Catholic Charities' records was in May 2016. The last time Caraballo saw Jordan was in the fall 2016. Caraballo testified that she recalled "he was outside.

It was fall." According to Caraballo, she asked Larissa about Jordan in the spring 2017, because Caraballo had not seen Jordan in a while. Caraballo testified that Larissa answered her as follows: "[S]omeone was caring for Jordan, that he was in a good place. She says he's in a good place . . . . He's fine. He's fine. And because of his disability, somebody is taking care of him and I believed her."

{¶ 38} Caraballo testified at trial that she did not follow up on Jordan's whereabouts nor did she document in any of Catholic Charities' records that Jordan was "gone from the family." Specifically, Caraballo testified as follows: "I didn't put it. Once she told me that, I didn't ask anymore because she told me — she said he's in a good place, don't worry, he's fine. That's what she said." Caraballo testified that, during the entire time she worked for Catholic Charities, she was aware that Larissa suffered from mental-health issues and was not always medication-compliant. Caraballo further testified that she did not report to anyone that a developmentally delayed young child under the care of a mother with mental-health issues was "unaccounted for" after Larissa told her that Jordan was no longer living in Larissa's home.

{¶ 39} Caraballo admitted that she was a mandatory child abuse and neglect reporter, but she did not report any abuse or neglect concerning Larissa's family. According to Caraballo, Larissa "never abused the kids in front of my eyes. If she did it, she did it when I walked out the door."

{¶ 40} Caraballo testified that she was aware of when Christopher moved into Larissa's home, but she never discussed the change in family dynamics with

anyone at Catholic Charities nor did she look into any information about Christopher.

{¶ 41} Asked if "knowing Larissa . . . as long as you did clouded your judgment," Caraballo answered, "Yes." Caraballo testified that no one from Catholic Charities followed up on her conduct. Catholic Charities conceded that Caraballo's conduct, particularly the obvious falsification of home visit reports, raised suspicion and was "not acceptable."

{¶ 42} During Jordan's short lifetime, no supervisor from Catholic Charities went to Larissa's home, with or without Caraballo, and no one from Catholic Charities, other than Caraballo, ever spoke with Larissa. According to Catholic Charities, Caraballo "had not laid eyes on Jordan since late 2016 or early 2017."

{¶ 43} Caraballo admitted to purchasing Larissa's food stamps, via an electronic benefit card, for "less than full value." In a note Caraballo wrote as part of Catholic Charities' records after a home visit with Larissa's family on July 10, 2017, Caraballo stated that Larissa told her it was "hard for her to cook healthy meals because she was running out of food" at the end of the month. According to Caraballo, she did not follow up on Larissa's statement, nor did anyone at Catholic Charities follow up on Caraballo's notation.

{¶ 44} Although the medical examiner's office did not determine the cause of Jordan's death beyond homicide in an unspecified manner, an expert medical witness for the Estate testified that Jordan died from starvation, which occurred over a three-to-six-month period. That doctor further testified that Jordan's broken

arm and rib bones occurred when he was alive, indicating abuse. The doctor also testified that there was no evidence that these injuries had been medically treated. The injuries would have been painful to Jordan and, as to the broken arm bone and starvation, visible and identifiable to an observer.

{¶ 45} Angel Bolivar ("Bolivar"), Larissa's oldest child and Jordan's half-brother, testified that the last time he lived with Larissa was in June 2016. Bolivar left because Larissa did not want him there any longer after he "tried to protect [his] siblings from Chris[topher]." That was the last time he saw Jordan.

{¶ 46} Bolivar went to Larissa's house one time in July 2017, but Jordan was not there. Larissa told Bolivar that Jordan was in Texas with his aunt, which is similar to the story she told the police when they arrived at her house the day Jordan's body was discovered in December 2017.

{¶ 47} Bolivar testified that he had seen Caraballo at Larissa's house, although he had no idea that "she was the caseworker." According to Bolivar, Caraballo and Larissa "used to sit on the couch and just talk and she would be there about five, six minutes and just leave." Bolivar testified that he never saw Caraballo interact with his siblings, walk around the house, go upstairs or into the kitchen or talk with Larissa about his siblings.

{¶ 48} Christopher testified that, in February 2016, he began communicating with Larissa through Facebook. Christopher and Larissa first met in person in March 2016 and Christopher moved into Larissa's house the same night they met. Christopher testified that Jordan was the first of Larissa's children to talk to him.

Christopher testified that Jordan "asked me if I was his dad." According to Christopher, Jordan spoke and he "was like a normal kid."

{¶ 49} Asked if there were "any issues with lack of food" in Larissa's house, Christopher answered, "No." Christopher testified that he knew Caraballo was buying Larissa's food stamps, but this had no "impact whatsoever on the amount of food that was in the house."

{¶ 50} Christopher testified about a scab that Jordan had on his head. According to Christopher, Jordan kept picking at this scab and it became the size of a baseball. Larissa and Christopher could not stop Jordan from picking at this scab and they put a pull-up diaper on his head. Jordan continued to wear this diaper on his head for a "few weeks." When Jordan's body was discovered buried in Larissa's backyard, he had a diaper on his head.

{¶ 51} Christopher further testified that when Larissa "wanted to go out [to] eat" or go shopping or to the park, "she would leave Jordan in the house locked in the attic."

{¶ 52} According to Christopher, Jordan died on September 22, 2016. To be clear, Christopher testified that Jordan died in September 2016, not September 2017. Christopher testified that near the end of August or early September 2016, Jordan "just wouldn't eat no more. He wouldn't drink." Christopher testified that "a couple of nights before September 22nd" Jordan slept in Larissa and his room. According to Christopher, Jordan "was still breathing, he just said he wasn't feeling well." Christopher went to work the morning of September 22, and, shortly after he

arrived, he received a phone call from Larissa, who said that Jordan "stopped breathing and wasn't alive." Christopher testified that he went home and "started doing CPR on" Jordan, "and that's when I felt the ribs break."

{¶ 53} Christopher and Larissa decided not to call an ambulance or the police for fear of going to prison and losing the children. They put Jordan in their bed where he stayed "for about two or three days." After this, Jordan started to smell. Christopher's testimony continued: "And if I can smell him, the rest of everybody in the house is going to be able to smell him." Christopher and Larissa put Jordan's body in the attic "where he stayed for about two or three weeks. And we'd get bleach, we would get mothballs and incense trying to hide the smell." After this, Christopher and Larissa buried Jordan's body in the backyard "off the back porch, the deck, down the steps, there was a spot right by the fence . . . ."

## III. Law and Analysis

{¶ 54} For ease of discussion, we address the Estate's assignments of error out of numerical order.

### A. Recognition and Admissibility of the CJE

{¶ 55} In the Estate's fourth assignment of error, it argues that the trial court erred when it "simply chose to wholly disregard the [CJE] as if it never existed." According to the Estate, the "findings of fact contained within the [CJE] had [a] preclusive effect and could not be contested by [Catholic Charities] or disregarded by the jury." The Estate's argument is twofold. First, the court erred by refusing to acknowledge the CJE when making rulings, such as denying the Estate's motion to

take judicial notice of the CJE. Second, the court erred by ruling the CJE was inadmissible at trial.

{¶ 56} Catholic Charities, on the other hand, argues that because "a settlement agreement does not bind non-parties," the CJE does not bind nonparties. Catholic Charities further argues that, although the trial court "could have taken judicial notice" of the CJE, this would not "automatically make" the CJE relevant to the claims against Catholic Charities and, thus, it was inadmissible at trial.

{¶ 57} We agree with the Estate's argument, in part. Specifically, we agree that the court erred when it failed to acknowledge, or take judicial notice, of the CJE, although we disagree with the Estate regarding the effect the CJE had on the remainder of this case. As will be shown in our analysis of the Estate's second assignment of error, the pertinent effect of the CJE was that it established Caraballo's liability and the court erred when it disregarded this. Furthermore, we agree with the Estate that the court erred when it ruled the CJE was inadmissible at trial.

### 1. The Law

{¶ 58} Pursuant to Evid.R. 408, evidence of offers and acceptances of settlement agreements is inadmissible "to prove liability for . . . the claim . . . ." However, nothing in Evid.R. 408 covers the admissibility of CJEs. Therefore, we reject Catholic Charities' argument that the CJE is not admissible at trial because settlement agreements are inadmissible. Indeed, Catholic Charities cites no law to

support its proposition that a CJE is "inadmissible" because it is a settlement agreement.

{¶ 59} The Ohio Supreme Court has held that, "as a general rule, a consent judgment operates as *res judicata* with the same force given to a judgment entered on the merits in a fully adversarial proceeding." *Gilbraith v. Hixson*, 32 Ohio St.3d 127, 129 (1987). "Implicit in the rule is the recognition that a judgment entered by consent, although predicated upon an agreement between the parties, is an adjudication as effective as if the merits had been litigated and remains, therefore, just as enforceable as any other validly entered judgment." *Id.* In *Gilbraith*, the Ohio Supreme Court found that a consent judgment entry "cannot, in law, be denied *res judicata* effect simply because it results from an agreement between parties in a nonadversarial proceeding." *Id. See also Pollack v. Trustar Funding, L.L.C.,* 2019-Ohio-3272, ¶ 29 (8th Dist.) (citing *Gilbraith* with approval); *Infinite Sec. Solutions, L.L.C. v. Karam Props. II,* 2015-Ohio-1101, ¶ 27 ("In a consent decree, the litigants stipulate to the termination of a lawsuit by assenting to specified terms, which the court agrees to enforce as its judgment by journalizing an entry reflecting the terms of the settlement agreement.").

{¶ 60} Additionally, Evid.R. 201 governs "judicial notice of adjudicative facts," also known as "judicial notice of . . . the facts of the case." Evid.R. 201(A). Section (B)(2) states that a "judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Furthermore,

Evid.R. 201(D) states that a "court shall take judicial notice if requested by a party and supplied with the necessary information."

{¶ 61} Ohio courts consistently hold that, although "a trial court cannot take judicial notice of court proceedings in another case," the trial court may "take judicial notice of the proceedings in the immediate case." *NorthPoint Props. v. Petticord*, 2008-Ohio-5996, ¶ 16 (8th Dist.); *Diversified Mtge. Investors, Inc. v. Athens Cty. Bd. of Revision*, 7 Ohio App.3d 157, 159 (4th Dist. 1982).

### a. The CJE in this Case

{¶ 62} In this case, the court held a hearing on September 8, 2021, during which Caraballo's attorney explained the CJE as follows: "So the idea is that . . . Caraballo would stipulate to certain established facts in the record. Those facts would then establish that the Court could make a finding of liability and enter a judgement against . . . Caraballo. There would then be an agreement not to collect from . . . Caraballo and the case would proceed accordingly." The Estate's attorney agreed on the record with this explanation and added that the CJE was necessary because "the insurers for Catholic Charities have refused to indemnify and/or negotiate in good faith."

{¶ 63} The Estate's attorney further stated at this hearing that the CJE was based on admissions Caraballo made at her deposition, along with affidavits and transcripts from several other depositions, regarding instances when Caraballo deviated from the standard of care in this case.

{¶ 64} The court held a hearing on December 7, 2022, on Caraballo's motion to enforce the settlement agreement. At this hearing, Caraballo's attorney stated that the Estate and Caraballo entered into a settlement agreement on September 29, 2021, in which the Estate "will release . . . Caraballo from all claims brought in the complaint, they will dismiss her with prejudice, and they will agree not to collect any of the settlement funds from her."

{¶ 65} An attorney for the Estate stated that "this settlement is between the Estate and [Caraballo] in her individual capacity. However, there remain claims against Catholic Charities for vicarious liability through the actions of . . . Caraballo and those claims and causes of action and allegations can continue in this case. This settlement is for purposes and the dismissal's for purposes of her individually only."

{¶ 66} Caraballo's attorney added the following: "Just to be clear, your Honor, . . . Caraballo has stipulated to the settlement. She takes no position on the effect of that for the future of the claim. That's her position . . . . I don't think she can take any position on what the effect of that settlement is in the future, other than she's released from that claim."

{¶ 67} An attorney for Catholic Charities stated the following: "We don't take a position on this. We were not a party to the settlement. We were not invited to be a party to it. I just want to be clear on the record it's our position that the settlement agreement has no impact, whatsoever, on Catholic Charities' ability to defend its case and possible affirmative defenses going forward."

{¶ 68} In December 2022, the court granted Caraballo's motion to enforce settlement "with the understanding that was just stated by the parties . . . ." The court signed, approved and filed the CJE. "The Court is going to enter two separate agreed entries. One is going to be the settlement agreement as an agreed entry, . . . and then the other is going to be what was titled an agreed judgment entry . . . . Actually, three because there also will be an order that says that under the Court's order the motion is granted and cases are dismissed."

{¶ 69} On July 31, 2023, the court granted Catholic Charities' motion in limine to exclude any reference to the CJE at trial. According to the court, any mention of the CJE "would be highly prejudicial and would confuse the jury . . . ." The court did not explain how this evidence would prejudice Catholic Charities. At trial, an attorney for the Estate revisited this issue, and the court ruled that any evidence of, or reference to, the CJE was inadmissible.

### 2. Analysis

### a. Judicial Notice of the CJE

{¶ 70} Our review of Ohio law reveals no case directly on point with the facts herein. Of the cases we found that review taking judicial notice of a journal entry, all of them concerned the trial court improperly admitting into evidence a journal entry from a different case. That may be because it is elementary that a court may take judicial notice of a journal entry filed in the immediate case before it. *See, e.g., Diversified,* 7 Ohio App.3d 157.

**{¶ 71}** We apply *Gilbraith* to the facts of this case and hold that the CJE has the same force and effect as a judgment on the merits in this case.[3] The CJE finds in favor of the Estate on all claims against Caraballo. This has the same force and effect as if the jury had found in favor of the Estate on all claims against Caraballo. In other words, the CJE establishes Caraballo's liability in this case.

**{¶ 72}** Given Evid.R. 201(D)'s mandate that a "court shall take judicial notice if requested by a party and supplied with the necessary information," we find that the court erred by denying the Estate's motion to take judicial notice of the CJE.

### b. Admissibility of the CJE

**{¶ 73}** The Estate further argues that it should have been allowed to introduce evidence of the CJE at trial to, for example, impeach Caraballo if she testified inconsistently with her admissions in the CJE. Catholic Charities argues on appeal that it would have been prejudiced by the admission of the CJE because the Estate was trying "to prevent the jury from deciding facts relevant to [the Estate's] claims."

**{¶ 74}** "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). An abuse of discretion is "a court exercising its judgment, in an unwarranted way, in regard to a matter over which is has discretionary authority." *Johnson v. Abdullah*,

---

[3] We note that the CJE was signed and approved by Judge Joan Synenberg on December 19, 2022. Judge Synenberg was replaced by Judge Brian Mooney. By January 13, 2023, Judge Mooney had taken over Judge Synenberg's docket and made all of the rulings in this case subsequent to that date.

2021-Ohio-3304, ¶ 35. Pursuant to Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is not admissible, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶ 75} We must determine whether evidence of the CJE is relevant under Evid.R. 401 and prejudicial under Evid.R. 403. Upon review, we find that the CJE is relevant to this case, because it *was issued in **this** case* and because the facts surrounding Caraballo's liability are directly related to whether Catholic Charities is vicariously liable for her negligence.

{¶ 76} While somewhat unclear from Catholic Charities' brief, it appears the argument it makes regarding prejudice is it would violate the right to a jury trial if the CJE was "binding" on Catholic Charities. This argument mischaracterizes the effect of the CJE. The CJE in this case is binding on the Estate and Caraballo, who are the only two parties to the CJE. The CJE does not "bind" Catholic Charities to anything. Having said that, the CJE established Caraballo's liability in this case. Catholic Charities does not make any other argument concerning prejudice under this assignment of error, and we will not make one for it. As such, we find no prejudice in admitting the CJE into evidence.

{¶ 77} Upon review, we find the court abused its discretion by granting Catholic Charities' motion to exclude any reference to the CJE at trial. The CJE is

relevant, and its probative value is not outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury.

{¶ 78} The Estate's fourth assignment of error is sustained.

**B. Directed Verdict — Vicarious Liability**

{¶ 79} In the Estate's second assignment of error, it argues that the trial court's "entry of a directed verdict upon the claims of respondeat superior liability was contrary to law" based on, among other things, *Clawson,* 2022-Ohio-4154. According to the Estate, the trial court agreed with Catholic Charities that Catholic Charities "could not be held derivatively liable for the tortious wrongdoing of its employee, Caraballo, as a matter of law . . ." because the Estate's "settlement with and release of Caraballo for these claims in actuality precludes any finding of vicarious liability against her employer Catholic Charities." In its appellate brief, the Estate argues that *Clawson* is distinguishable from this case "in that . . . Caraballo stipulated to her violations of the duty of care, was found liable by the Trial Court, and remains subject to a $36 million consent judgment."

**1. The Law**

{¶ 80} Civ.R. 50 governs directed verdicts and pursuant to Section (A)(4),

> When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶ 81} A "motion for directed verdict presents a question of law, and not a factual issue . . . ." *Ruta v. Breckenridge*, 69 Ohio St.2d 66, 69 (1982). This court has consistently held that a "motion for directed verdict 'tests the legal sufficiency of the evidence.'" *Lang v. Beachwood Pointe Care Ctr.*, 2017-Ohio-1550, ¶ 11 (8th Dist.), quoting *McKenney v. Hillside Dairy Co.*, 109 Ohio App.3d 164, 176 (8th Dist. 1995). We review the trial court's ruling on a motion for directed verdict under a de novo standard. *Zappola v. Rock Capital Sound Corp.*, 2014-Ohio-2261, ¶ 40; *Groob v. KeyBank*, 2006-Ohio-1189, ¶ 14.

{¶ 82} "It is a fundamental maxim of law that a person cannot be held liable, other than derivatively, for another's negligence." *Albain v. Flower Hosp.*, 50 Ohio St.3d 251, 254-255 (1990). However, "an employer or principal is vicariously liable for the torts of its employees or agents under the doctrine of respondeat superior . . . ." *Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 438 (1994). "Although a party injured by an agent may sue the principal, the agent, or both, a principal is vicariously liable only when an agent could be held directly liable." *Natl. Union Fire Ins. Co. v. Wuerth*, 2009-Ohio-3601, ¶ 22.

{¶ 83} In *Losito v. Kruse*, 136 Ohio St. 183, 188 (1940), the Ohio Supreme Court found that a "settlement with and release of the servant will exonerate the master."

{¶ 84} In *Strock v. Pressnell*, 38 Ohio St.3d 207 (1988), the Ohio Supreme Court found that an action for negligent supervision and training could not lie against a church when the action against the church's minister was dismissed

pursuant to Civ.R. 12(B)(6). In *Strock*, the plaintiff sued a minister for "clergy malpractice" among other claims, and the minister's church for negligent supervision and training. The Ohio Supreme Court affirmed the dismissal of the claims against the minister for various reasons, including that the facts of the case did not lend themselves to a malpractice action. *Id.* at 212. The Court also found that no action could lie against the church and held as follows:

> It is axiomatic that for the doctrine of *respondeat superior* to apply, an employee must be liable for a tort committed in the scope of his employment. Likewise, an underlying requirement in actions for negligent supervision and negligent training is that the employee is individually liable for a tort or guilty of a claimed wrong against a third person, who then seeks recovery against the employer. Because no action can be maintained against [the employee] in the instant case, it is obvious that any imputed actions against [the employer] are also untenable.

(Emphasis in original.) *Id.* at 217.

{¶ 85} In *Natl. Fire Ins. Co. v. Wuerth*, 2009-Ohio-3601, the Ohio Supreme Court extended this line of reasoning to law firms. "There is no basis for differentiating between a law firm and any other principal to whom Ohio law would apply. . . . [A] law firm has no vicarious liability unless at least one principal or employee of the firm is liable." *Id.* at ¶ 24. "Based on this authority, we hold that a law firm may be vicariously liable for legal malpractice only when one or more of its principals or associates are liable for legal malpractice." *Id.* at ¶ 26.

{¶ 86} In *Clawson*, 2022-Ohio-4154, the Ohio Supreme Court considered "whether a plaintiff may prevail on a claim of chiropractic malpractice against a chiropractor's employer under the doctrine of respondeat superior when the

expiration of the applicable statute of limitations has extinguished the chiropractor's direct liability for the alleged malpractice." *Id*. at ¶ 1. The *Clawson* Court determined that, based on *Wuerth* and "basic principles of agency law," the answer to this question is no. *Id*. The dismissal of the employee in *Clawson* resulted in the claim against the employer being "extinguished by operation of law." *Id*. at ¶ 33. *See also Comer v. Risko*, 2005-Ohio-4559, ¶ 25 (A "claim against a hospital premised solely upon the negligence of an agent who cannot be found liable is contrary to basic agency law.").

{¶ 87} However, in *State ex rel. Sawicki*, 2010-Ohio-3299, the Ohio Supreme Court declined to apply this line of reasoning to a private healthcare provider when the individual doctor, who also worked for a government-run hospital, was dismissed from the case based on political-subdivision immunity. In *Sawicki*, the defendant-doctor "was both a state employee of [a] medical college hospital and a private employee of Associated [Physicians of MCO, Inc.,]" a private corporation. *Id*. at ¶ 3. The plaintiff sued the doctor and Associated; however, "the hospital was not named as a party." *Id*. The doctor was dismissed from the medical malpractice case filed in common pleas court because "the Court of Claims had exclusive jurisdiction to determine whether" political subdivision immunity applied to the case. *Id*. at ¶ 4. After the doctor was dismissed, the plaintiff "conceded that he had not filed in the Court of Claims and that such an action would now be time-barred." *Id*. at ¶ 6. This left Associated, a private employer, as the sole defendant in a medical malpractice claim based on respondeat superior. *Id*. at ¶ 13.

{¶ 88} The *Sawicki* Court held that an "employee's immunity from liability is no shield to the employer's liability for acts under the doctrine of respondeat superior." *Id.* at ¶ 28. "A private employer may still be liable even if the employee is personally immune, for the doctrine of respondeat superior operates by imputing to the employer the acts of the tortfeasor, not the tortfeasor's liability." *Id.* The court reasoned that "'a determination of immunity is not a determination of liability.'" *Id.*, quoting *Johns v. Univ. of Cincinnati Med. Assocs.*, 2004-Ohio-824, ¶ 37.

### 2. Analysis

{¶ 89} We find this case distinguishable from *Losito*, *Strock*, *Wuerth* and *Clawson*. In those cases, the liability of the employee was extinguished, whether by settlement and dismissal, the statute of limitations or dismissal pursuant to Civ.R. 12(B)(6). In this case, Caraballo admitted liability in her deposition and during her testimony at trial. Additionally, the court found Caraballo liable in the CJE. Furthermore, a jury found Catholic Charities liable for negligent supervision, and an element of negligent supervision is that the employee who was negligently supervised, i.e., Caraballo, also acted negligently. *See Brown v. Holiday Inn Express & Suites*, 2018-Ohio-3281, ¶ 16 (10th Dist.) (A claim for negligent supervision "seeks to hold an employer liable for its own conduct in negligently supervising an employee whose tortious conduct injured the plaintiff."). Moreover, during the apportionment phase of trial in this case, the jury found Caraballo 2 percent liable. Therefore, Caraballo's liability was not extinguished in this case. Indeed, it was established in more ways than one.

{¶ 90} The precise issue before us — whether, as a matter of law, Catholic Charities may be found vicariously liable for Caraballo's negligence when Caraballo admitted liability in the CJE, in her deposition and at trial; the jury found Caraballo liable as an element of negligent hiring, training and supervision and via apportionment; and the court found Caraballo liable in the CJE — appears to be an issue of first impression in Ohio. Although we find no case law directly on point, the Ohio Supreme Court provides guidance in *Comer*: "If there is no liability assigned to the agent, it logically follows that there can be no liability imposed upon the principal for the agent's actions." *Comer*, 2005-Ohio-4559, at ¶ 20. It also logically follows that if the agent's liability has been established, there is sufficient evidence for a jury to impose liability upon the principal for the agent's actions. Accordingly, we find that *Clawson* and its predecessors do not apply to the Estate's claims against Catholic Charities.

{¶ 91} Having found that *Clawson* does not apply, we further find that the trial court erred by granting Catholic Charities' motion for directed verdict on the Estate's various claims based on insufficient evidence of vicarious liability. Construing the evidence most strongly in favor of the Estate, as we must, we find sufficient evidence of vicarious liability. All of the Estate's claims against Catholic Charities should have gone to the jury for deliberation. To be clear, we offer no opinion on the merits of the Estate's claims against Catholic Charities. We hold here only that the court erred by directing a verdict in favor of Catholic Charities on all claims based on no vicarious liability as a matter of law because *Clawson* does not

apply to the facts of this case and the Estate set forth sufficient evidence to show that Catholic Charities was vicariously liable for Caraballo's negligence.

{¶ 92} Accordingly, the Estate's second assignment of error is sustained.

## C. Expert Testimony on the Issue of Causation

### 1. Admissibility of Evidence Standard of Review

{¶ 93} As stated previously, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *Sage*, 31 Ohio St.3d at 180.

### 2. The Parties' Arguments and the Court's Ruling

{¶ 94} According to the Estate's first assignment of error, the trial court abused its discretion by "barring all expert opinion testimony on the issue of causation." To be clear, the trial court allowed the Estate to introduce testimony at trial that the cause of Jordan's death was starvation and neglect but it did not allow the Estate's experts to testify that, but for Caraballo and Catholic Charities' negligence, CCDCFS would have removed Jordan from Larissa's home and he would not have died. At a July 2023 pretrial hearing on multiple motions in limine, the Estate's attorney stated, on the record, that the gist of its case was "had [Caraballo and Catholic Charities] been in the home, they would have seen obvious signs of nutritional neglect and abuse — physical abuse that was occurring to Jordan" and he would have been removed from Larissa's home, thus preventing his death. According to evidence presented at trial, these "obvious signs" of neglect and abuse

included a weeping wound on Jordan's head for several months, a pull-up diaper on his head to cover this wound, broken bones and wasting from starvation.

{¶ 95} The Estate had three expert witnesses who were prepared to testify that "more probably than not," had Caraballo and Catholic Charities been in Larissa's home, properly done their jobs and reported abuse, Jordan would have been removed from Larissa's home by CCDCFS, thus preventing his death. All three expert witnesses held doctorate-level degrees in the areas of social work, child abuse, child welfare services or pediatric pathology.

{¶ 96} Catholic Charities argued that the Estate's "experts were properly excluded from presenting this speculative, unsupported, and unreliable causation theory." Specifically, Catholic Charities argued that the Estate's "experts crossed into speculation when they attempted to testify that certain actions, if taken by Caraballo or Catholic Charities," would have resulted in Jordan's removal from the home.

{¶ 97} On July 28, 2023, the court issued a journal entry granting Catholic Charities' motion in limine to exclude the Estate's "experts from offering speculative opinions on causation . . . ." On July 31, 2023, the Estate filed a "trial brief requesting clarification" on the court's ruling because "it would be reversible error if the court bars all of plaintiff's expert [witness] trial testimony" on this issue.

{¶ 98} The court held a hearing on July 31, 2023, on this request for clarification, among other things. At this hearing, the court stated as follows:

You're talking about these opinions the — I've read through the experts and I've seen a little bit on both sides where I think it's certainly proper for an expert to come in and offer an opinion on duty of care or the deviation from the standard of care and duty of care.

But I've also seen what I deem as speculation, which is couched within an expert — they offer an opinion — and I've seen both sides. But for this act, [CCDCFS] might have investigated or [Jordan] would not have died.

{¶ 99} The Estate asked for clarification as to why the court was "inclined to bar plaintiff from presenting causation evidence through our expert" witnesses. The court asked the Estate what it meant by "causation evidence." The Estate's attorney replied, "That the experts opine that had . . . Caraballo complied with the standard of care, more likely than not, the child would have been removed from the home."

{¶ 100} The court responded by stating the following:

That's speculation. That's speculation . . . . That is pure speculation.

Now, that is a very good argument. Now, I'm not denying that you have a good — I don't want to use the term good. You have some facts on your side. But that is a clear argument that you should make as an attorney.

I think you can argue properly a standard of care deviation. You can argue fair play, what . . . Caraballo should have done or what Catholic Charities should have done or what policies they should have had. But to argue — to have — couch an expert opinion speculation that maybe that the child would have been removed or would still be alive, that's speculation . . . .

. . . It's not — It's not expert opinion on causation.

{¶ 101} The Estate's attorney stated at this hearing that, if it was barred from presenting evidence of causation, the court might be inclined to grant a directed verdict or dismiss the case. The court assured the Estate that it "sure can" present

evidence of causation and then proceeded to explain to the Estate that it could "make an argument that [Jordan] would still be alive and all this — that's all within an attorney's argument supported by the facts. But to have — to couch it with experts offering an opinion on that speculation, you know, the Court does not deem that proper as an expert." We note that, contrary to the trial court's assurance, "presenting evidence" of causation is different than "making an argument" about causation.

{¶ 102} The court continued to insist that an "expert can't draw that conclusion and offer it to the jury as expert evidence." Additionally, the court reiterated its belief that "to tie that altogether, that's attorney argument." The court concluded by stating that "the basis what I decided is I'm going to bar speculative testimony couched as expert opinion on causation."

{¶ 103} The issue was revisited at a sidebar conference during trial and the court explained its reasoning behind excluding this testimony was that "an expert as to the causation is speculative and I don't believe it's — I don't believe we should have that type of expert opinion. It's a speculative — it's speculative. It's not expert . . . . [L]et's be clear, the Court doesn't view that as causation; it's speculation . . . . I don't think you need to have expert opinions on causation . . . . It's a jury issue I believe. [M]y belief is that that is [the] prerogative of the jury. I know you feel that expert [testimony] is necessary. And I hope I'm right. I don't know."

### 3. The Law

{¶ 104} Evid.R. 702 governs expert witness testimony, and it states, in part, as follows:

> A witness may testify as an expert if the proponent demonstrates to the court that it is more likely than not that all of the following apply:
>
>> (A) The witness' testimony . . . relates to matters beyond the knowledge or experience possessed by lay persons . . .
>>
>> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>>
>> (C) The witness' testimony is based on reliable scientific, technical or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case . . . .

{¶ 105} "Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met." *State v. Nemeth*, 82 Ohio St.3d 202, 207 (1998). *See also Terry v. Caputo*, 2007-Ohio-5023, ¶ 24 ("This gatekeeping function imposes an obligation upon a trial court to assess both the reliability of an expert's methodology and the relevance of any testimony offered before permitting the expert to testify.").

{¶ 106} Additionally, Evid.R. 704 states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." The staff notes to this evidence rule state, in part, that "[o]pinion testimony on an ultimate issue is admissible if it assists the trier of fact, otherwise it is not admissible."

{¶ 107} In this case, the parties are not disputing whether the witnesses at issue were qualified as experts under Section (B) of Evid.R. 702. Rather, the trial court reasoned that, under Section (C), the expert testimony at issue was speculative, rather than reliable. Additionally, it appears that the trial court also reasoned that, possibly under Section (A), expert testimony regarding causation was not necessary in this case because the steps CCDCFS may take after receiving a mandatory report of child abuse or neglect under R.C. 2151.421 are within the "knowledge or experience possessed by lay persons . . . ."

{¶ 108} As to Section (A), "Generally, a plaintiff must present expert testimony on the issue of proximate cause when the causal connection between the negligence and the injury is beyond the common knowledge and understanding of the jury. . . . However, expert opinion testimony is not necessary in a negligence action when the causal relationship is a matter of common knowledge." *Driscoll v. Gruss*, 1999 Ohio App. LEXIS 166 (8th Dist. 1999).

{¶ 109} As to Section (C), "[T]he admissibility of expert testimony that an event is the proximate cause is contingent upon the expression of an opinion by the expert with respect to the causative events in terms of probability." *Stinson v. England*, 69 Ohio St.3d 451, 455 (1994). The *Stinson* Court further held that "an event is probable if there is a greater than fifty percent likelihood that it produced the occurrence at issue." *Id.*

## 4. The Proffered Testimony in this Case

### a. Dr. Kathleen Faller

{¶ 110} Dr. Kathleen Faller ("Dr. Faller") testified in her deposition that she is a licensed social worker and she holds a Ph.D. in social work and psychology from the University of Michigan. Dr. Faller has been a professor at the University of Michigan since 1982 and she is the "co-director of the Family Assessment Clinic, which is a child welfare clinic located in Ann Arbor, Michigan." Dr. Faller also provides training to child welfare workers at the national level through the National Child Welfare Work Force Institute.

{¶ 111} The Estate engaged Dr. Faller to review this case and to render an opinion "in the field of social welfare work."[4] Because the trial court ruled that certain portions of Dr. Faller's expert opinion were inadmissible at trial, the following is taken from her deposition and expert report.

{¶ 112} Asked in her deposition if all the opinions she "rendered in this case were more probably true than not; in other words, greater than 50 percent," Dr. Faller answered, "Yes." Asked if her opinions were based on "a reasonable degree of certainty, more probably true than not," Dr. Faller answered, "More probably." Specifically, the following colloquy occurred during Dr. Faller's deposition:

---

[4] We are aware that Caraballo was not a licensed social worker and her employment at Catholic Charities as a parent educator did not require her to be a licensed social worker. However, Catholic Charities is a community services provider hired by CCDCFS, and Caraballo was the employee who provided services to Larissa's family. Because specific licensure is of no consequence to this case, the parties, the trial court and this court use the terms "social worker," "social welfare work," "child welfare services" and "service provider" interchangeably.

Q: Doctor, in your opinion, if Catholic Charities and . . . Caraballo had complied with the standard of care required of social welfare workers in a social welfare agency, do you have an opinion as to whether or not Jordan . . . would have likely been removed from the home of Larissa . . . in 2017?

A: I think it's likely that he would have been removed.

Q: If . . . Caraballo . . . . had reported the abuse or neglect that was occurring in the Rodriguez home in 2016 and 2017, and specifically that Jordan was being physically abused, or not being fed appropriately, do you have an opinion that, more probably true than not, Jordan would not have been in the home through the summer and fall of 2017?

A: I believe he would have been removed. Not only for — he was experiencing injuries at that time that would have surely led to his removal, or else intensive services.

. . .

Q: Do you have an opinion to a reasonable degree of certainty in the field of child welfare work that had . . . Caraballo made the appropriate visits, and had [Catholic Charities] provided the proper supervision . . . that it would have been more likely than not they would have seen and reported Jordan's abuse in the Rodriguez home in 2017?

A: Yes.

### b. Dr. Charles Montorio-Archer

{¶ 113} Dr. Charles Montorio-Archer ("Dr. Montorio-Archer") testified that he holds a Ph.D. in Public Management & Leadership, that he is a licensed attorney and he has a "certification in healthcare compliance, as well as corporate compliance and ethics." Dr. Montorio-Archer is the president and CEO of One Hope United, which partners "with not-for-profit in the care of people in the child welfare system." As part of his job with One Hope United, Dr. Montorio-Archer has written policies for "provider associations" within the child welfare system.

{¶ 114} Dr. Montario-Archer testified that he was hired by the Estate to review this case and provide an expert opinion, in part, as to whether "Catholic Charities deviated from the standard of care." Because the trial court ruled that certain portions of Dr. Montorio-Archer's expert opinion were inadmissible at trial, the Estate opted to not have him testify at trial and the following is taken from his deposition and expert report.

{¶ 115} According to Dr. Montorio-Archer, Caraballo had a conflict of interest by being Larissa's parent educator through Catholic Charities, because, by the time Catholic Charities became the service provider, Caraballo and Larissa's relationship was more "friendship" than it was professional. "My understanding of that relationship is that [Caraballo] perceived it to be a friendship and even made reference in her depositions that . . . it was perceived that they were cousins because they were so close and that they socialized as much as services were provided." According to Dr. Montorio-Archer, "a parent educator should not provide or deliver services to a friend."

{¶ 116} Dr. Montorio-Archer testified that Catholic Charities should have proceeded with a new intake form for Larissa and done "a reevaluation of the existing relationship" between Caraballo and Larissa, which is standard practice "for any other client . . . coming to the organization." Dr. Montorio-Archer further testified that "the minimum standards of practice . . . require a conflict of interest form be filled out on an annual basis." Dr. Montorio-Archer clarified that the

"minimum standards" to which he testified are the "standards of the vast majority of professionals in the human service and social service industry."

{¶ 117} Dr. Montorio-Archer additionally testified that a "supervisor" from Catholic Charities needed to have direct communication with Larissa. "At minimum — based on my understanding that the ongoing supervision was inadequate, the understanding would be at minimum on a quarterly basis to do a quality assurance or compliance check with families."

{¶ 118} According to Dr. Montorio-Archer, Caraballo, as a parent educator for Catholic Charities, was a mandatory reporter of child abuse and neglect, and she had "an obligation that is paramount to report . . . abuse related to children [and] she must also report abuse within the home." Dr. Montorio-Archer testified that "Catholic Charities and . . . Caraballo [were] the main in-home advocate or . . . presence . . . as it relates to reporting" concerning Larissa's family.

{¶ 119} Dr. Montorio-Archer was asked: "You fault Catholic Charities for the services they provided with respect to Jordan Rodriguez, correct?" The doctor answered, "Yes." Dr. Montorio-Archer concluded, in part, as follows: "Had Catholic Charities made proper inquiry from the beginning and continued to properly and adequately address potential and existing conflicts then they would have more likely than not prevented . . . Caraballo's exploitation of her relationship with Larissa . . . for personal gain." Dr. Montorio-Archer also concluded that "Catholic Charities failed to have adequate management structure of social workers and professionals required of social service organization; and failed to manage and execute policies,

procedures, regulations and practices under the standard of care, inclusive of maintaining conflicts of interest polices and gifts policies, which severely increased the likelihood of Jordan . . . being injured."

### c. Dr. Allecia Wilson

{¶ 120} Dr. Allecia Wilson ("Dr. Wilson") testified that she is a board-certified forensic and pediatric pathologist and that she is an associate professor in pathology, as well as the Director of Autopsy and Forensic Services, at the University of Michigan. Additionally, Dr. Wilson is the Chief Medical Examiner for the Washtenaw County Medical Examiner's Office in Ann Arbor, Michigan.

{¶ 121} The Estate engaged Dr. Wilson to review this case and to provide expert medical testimony regarding Jordan's cause of death. Dr. Wilson testified at trial and concluded that Jordan died of starvation. However, specifically as to this assignment of error, the court ruled that the following expert opinion of Dr. Wilson's was inadmissible at trial: "If Catholic Charities employees had properly seen Jordan while he was exhibiting signs of wasting throughout the starvation process, more likely than not, he would not have died." The trial court ruled this causation opinion inadmissible because it was speculative and because, in the court's opinion, causation in this case was an issue for the jury.

### 5. Analysis

#### a. The Expert Testimony on Causation Related to Matters Beyond the Common Understanding of the Jury – Evid.R. 702(A)

{¶ 122} In *State v. Boston*, 46 Ohio St.3d 108 (1989), the Ohio Supreme Court clarified that expert testimony under Evid.R. 702 is not limited to the medical or scientific fields.

> The rule provides that a witness qualified as an expert by knowledge, skill, experience, training or education may have her testimony presented in the form of an opinion or otherwise and it need not be just scientific or technical knowledge. The rule includes more. The phrase "other specialized knowledge" is found in the rule and, accordingly, if a person has information which has been acquired by experience, training or education which would assist the trier of fact in understanding the evidence or a fact in issue and the information is beyond common experience, such person may testify. . . . Even if the expert's testimony provides an opinion on an ultimate issue in a case, it is not objectionable. . . . Of course, all the foregoing is subject to the relevancy requirements of Evid.R. 402 and 403.
>
> Considering these rules, it becomes obvious that expert testimony is not limited only to those who might be trained in the fields of medicine, law, real estate, engineering or other sciences. In an appropriate case, a bank president could be an expert witness — and in child abuse cases, experts, properly qualified, might include a priest, a social worker or a teacher, any of whom might have specialized knowledge, experience and training in recognizing occurrences of child abuse.

*Id.* at 119.

{¶ 123} Our review of the parties' appellate briefs shows that neither side cited a case that involved the admissibility of expert witness testimony in a social welfare agency or community service provider negligence case. However, our review of the law revealed one case emanating from the Eleventh District Court of Appeals.

{¶ 124} In *Masek v. Gehring*, 2005-Ohio-3900, ¶ 16 (11th Dist.), the plaintiffs sued the Geauga County Department of Human Services ("Geauga") and Gehring, who was a social worker for Geauga, for various negligence-based claims regarding their involvement in a child abuse, neglect and dependency case. *Id.* at ¶ 7, 8. The court held that "the nature of the actions a social worker can take in regard to a dependent child is controlled by both certain state laws and, at times, the orders of a juvenile court. To this extent, many aspects of a social worker's duties would not be within the common understanding of a layperson, thereby resulting in the need for an expert witness." *Id.* at ¶ 16. *See also* R.C. 2151.421(A) through (O), which is a vast and detailed statute governing the mandatory reporting of child abuse or neglect.

{¶ 125} Additionally, although not in the area of child welfare agency negligence, *O'Brien v. DOT*, 2019-Ohio-724 (10th Dist.), is instructive. In *O'Brien*, the plaintiff sued the Ohio Department of Transportation ("ODOT") for negligence arising out of a motor vehicle accident. According to the plaintiff, ODOT's negligence was based on the signs that ODOT had installed at the intersection of the accident at issue. Specifically, the plaintiff "alleged that ODOT failed to follow the Ohio Manual of Uniform Traffic Control Devices . . . with respect to the signage" and this negligence "caused the driver to make the mistake that resulted in the collision and, consequently, his injuries." *Id.* at ¶ 2. The plaintiff proffered expert witness testimony "as to ODOT's negligence and to provide an opinion as to causation." *Id.* at ¶ 18. ODOT objected to the proposed testimony about causation, arguing it "was

impermissible under Evid.R. 702 because it 'offer[ed] nothing more than what you already know and what you have by the other evidence in this case to decide.'" *Id.* at ¶ 30. ODOT also argued that the causation testimony "is pure speculation." The trial court allowed this witness to testify "about signage that was there at the time" but not about causation. *Id.* at ¶ 31-32. The court ultimately ruled in favor of ODOT. *Id.* at ¶ 45, 49.

{¶ 126} The plaintiff appealed, arguing, in part, that the court erred in refusing to admit expert witness evidence. *Id.* at ¶ 54. ODOT, on the other hand, argued that "this matter 'centers on a person driving down a roadway and not proceeding and responding to the signs posted. It does not relate to knowledge or experience beyond a layperson.'" *Id.* at ¶ 55. The *O'Brien* Court concluded that "[b]ased on our thorough review of the record, we are not persuaded that this matter is as simple or straightforward as ODOT contends." *Id.* at ¶ 56.

{¶ 127} "ODOT's arguments to the effect that a car crash does not require an expert opinion because the act of driving was within the ambit of the [factfinder's] experience . . . was not based in law, and the magistrate abused her discretion in heeding it and limiting expert testimony from [the doctor] in creating the body of evidence on which she would base her decision." *Id.* at ¶ 58. The appellate court concluded that the proffered testimony "was relevant to the issue of causation in this matter. Consequently, we find that the [trial court's] ruling to exclude [this] testimony was an abuse of discretion that amounted to prejudicial error." *Id.* at ¶ 65.

{¶ 128} In this case, expert testimony would have established that CCDCFS had the option of removing Jordan from the home upon receipt of a mandatory report of child abuse or neglect and, more likely than not, CCDCFS would have removed Jordan from the home had Caraballo and Catholic Charities done their job, because they are mandatory reporters.

{¶ 129} The witnesses' testimony at deposition included terms such as "mandatory reporter" under R.C. 2151.421 and "conflict of interest," as well as concepts such as CCDCFS' authority to remove children from the home when child abuse or neglect is observed. We do not expect a layperson to know what the role of a community service provider is when they observe — or should have observed — the signs of child abuse and neglect. Therefore, we find that the excluded testimony related to "matters beyond the knowledge or experience possessed by lay persons."

{¶ 130} Accordingly, we find that the excluded testimony in this case met the requirement of Evid.R. 702(A) that, to be admissible, it must be beyond the common knowledge of laypersons.

### b. The Expert Testimony was not Speculative – Evid.R. 702(C)

{¶ 131} In *Shumaker v. Oliver B. Cannon & Sons*, 28 Ohio St.3d 367 (1986), the Ohio Supreme Court set forth the law regarding whether expert medical testimony regarding proximate cause was speculative.

> It is well-settled that the establishment of proximate cause through medical expert testimony must be by probability. At a minimum, the trier of fact must be provided with evidence that the injury was more likely than not caused by the defendant's negligence . . . . Opinions

expressed with a lesser degree of certainty must be excluded as speculative.

*Id.* at 369.

{¶ 132} Furthermore, in *Valentine v. Conrad*, 2006-Ohio-3651, ¶ 16, the Ohio Supreme Court analyzed how courts should determine the reliability of an expert's opinion under Evid.R. 702(C):

> In determining whether the opinion of an expert is reliable under Evid.R. 702(C), a trial court examines whether the expert's conclusion is based on scientifically valid principles and methods. . . . A court should not focus on whether the expert opinion is correct or whether the testimony satisfies the proponent's burden of proof at trial . . . . Accordingly, we are not concerned with the substance of the expert's conclusions; our focus is on how the experts arrived at their conclusions.

{¶ 133} In *Lucsik v. Kosdrosky*, 2017-Ohio-96, ¶ 15 (8th Dist.), this court held as follows regarding Evid.R. 702(C) and whether an expert witness' opinion is reliable:

> In Ohio, the admissibility of expert testimony on the issue of proximate cause is contingent on the expression of an opinion with respect to the causative event in terms of probability. *Stinson v. England*, 69 Ohio St.3d 451, 455 [1994]. "[A]n event is probable if there is a greater than fifty percent likelihood that it produced the occurrence at issue." *Id.* However, there is no requirement that an expert utter any magic words in terms of a reasonable degree of medical certainty or probability . . . . Rather, the expert's testimony, when considered in its entirety, must be equivalent to an expression of probability.

{¶ 134} The Sixth District Court of Appeals also analyzed this issue in *Heath Wallace, D.D.S., LLC v. Kalniz, Choksey Dental—Ralston, Inc.,* 2013-Ohio-2944, ¶ 36:

In determining whether an expert's opinions are reliable under Evid.R. 702(C), the trial court must determine whether the expert used reliable principles and methods, rather than whether the conclusions are correct . . . . As gatekeeper, the trial court must assess whether the expert's testimony is both relevant and reliable before admitting it into evidence . . . . "Expert testimony may not be based on mere speculation." *Rose v. Truck Centers, Inc.*, 611 F.Supp.2d 745, 750 (N.D.Ohio 2009) . . . . Assumptions upon which the expert bases his or her opinions must be supported by evidence in the factual record.

{¶ 135} In *Boston*, the Ohio Supreme Court made it clear that social workers could testify as expert witnesses in child abuse cases based on "reliable . . . specialized information" in their field. This is not a child abuse case. Rather, it is a wrongful death case based on Caraballo's negligence and Catholic Charities' alleged negligence, including the failure to report child abuse or neglect. We find this to be a distinction without a difference.

{¶ 136} The law is also clear that an expert witness may testify to the "ultimate issue" in a case as long as the guardrails of Evid.R. 702 are met. The ultimate issue in this case is whether Catholic Charities was negligent and, if so, whether this negligence caused, at least in part, Jordan's death. The guardrail at issue is whether the excluded testimony was reliable or speculative. Upon review, we find that all three witnesses' testimony included language akin to "more probable than not" when opining on whether Caraballo and Catholic Charities' negligence caused Jordan's death. None of the experts expressed their opinion in terms of possibilities. Therefore, the testimony at issue was not speculative.

{¶ 137} We find that the court abused its discretion by concluding that the Estate's expert testimony regarding causation was speculative, which somehow

rendered it not expert testimony. To be sure, the trial court stated multiple times that the testimony in question was "pure speculation . . . . It's not expert opinion on causation." Frankly, the trial court's finding that these opinions were speculative demonstrates a complete misunderstanding of the admissibility of expert witness testimony.

{¶ 138} Upon review, we find that the trial court abused its discretion by granting Catholic Charities' motion in limine to exclude the testimony of multiple expert witnesses from trial because the testimony meets all three prongs of Evid.R. 702, it "embraces an ultimate issue to be decided by the trier of fact" under Evid.R. 704, it is relevant to this case pursuant to Evid.R. 401 and it is not prejudicial, confusing or misleading under Evid.R. 403.

{¶ 139} Accordingly, the Estate's first assignment of error is sustained.

### C. Apportionment of Damages

{¶ 140} In the Estate's third assignment of error, it argues that the trial court erred by allowing Catholic Charities to apportion liability to MetroHealth employees, Caraballo, Larissa, Christopher and CCDCFS employees. Catholic Charities, on the other hand, argues that "the trial court did not abuse its discretion in submitting a jury interrogatory on apportionment of liability." Specific arguments will be outlined in detail below.

#### 1. The Law

{¶ 141} Pursuant to R.C. 2307.22(A)(1), if the trier of fact determines that "more than fifty percent of the tortious conduct [in a tort case] is attributable to one

defendant, that defendant shall be jointly and severally liable in tort for all compensatory damages that represent economic loss." However, if the trier of fact determines that 50 percent or less of the tortious conduct is attributable to one defendant, that defendant is liable to the plaintiff only for its proportionate share of compensatory damages.

{¶ 142} R.C. 2307.23, which determines how to calculate the apportionment of damages in a tort action, states, in part, as follows:

> (A) In determining the percentage of tortious conduct attributable to a party in a tort action . . .[,] the jury . . . shall return a general verdict accompanied by answers to interrogatories that shall specify . . .
>
> > (1) The percentage of tortious conduct that approximately caused the injury or . . . wrongful death that is attributable to the plaintiff and to each party to the tort action . . .; [and]
> >
> > (2) The percentage of tortious conduct that proximately caused the injury or . . . . wrongful death that is attributable to each person from whom the plaintiff does not seek recovery in this action.
>
> (B) The sum of the percentages of tortious conduct as determined pursuant to division (A) of this section shall equal one hundred per cent.

{¶ 143} In other words, "R.C. 2307.23(A) requires the trier of fact to make factual findings specifying the percentage of fault attributable to the plaintiff, to each party from whom the plaintiff seeks recovery, and . . . to each person from whom the plaintiff does not seek recovery in the action." *Simpkins v. Grace Brethren Church of Delaware,* 2014-Ohio-3465, ¶ 46 (5th Dist.). R.C. 2307.23(A)(2), which allows defendants to raise the issue of apportionment as to nonparties, is often referred to

as the "empty chair" defense. *See, e.g., Fisher v. Beazer E., Inc.,* 2013-Ohio-5251, ¶ 38 (8th Dist.).

{¶ 144} Pursuant to R.C. 2307.23(C), a defendant in a tort action is permitted to raise apportionment as an affirmative defense at any time prior to trial. *See Simpkins* at ¶ 52. In *Fisher* at ¶ 37, this court set forth a defendant's burden of proof concerning apportionment of damages: "R.C. 2307.23 requires only that a defendant raise the 'empty chair' as an affirmative defense, present evidence regarding contributory fault, and submit proposed jury instructions or interrogatories to the trial court regarding the liability of others."

{¶ 145} Our review of the record shows that Catholic Charities raised apportionment as an affirmative defense in its October 9, 2020 answer to the Estate's second amended complaint. Additionally, the court had the jury answer the following interrogatory: "If you have found that the defendant Catholic Charities and/or other individuals that the [Estate] did not seek recovery from in this trial . . . were at fault and that such fault was a proximate cause of Jordan Rodriguez's death, then you must allocate the percentage of fault attributed to Catholic Charities . . . and/or the other individual or individuals." The interrogatory listed the following "other individuals": Caraballo, CCDCFS and its employees, MetroHealth Medical Center's employees and/or independent contractors, Christopher and Larissa.

{¶ 146} Upon review, we find that Catholic Charities properly raised the empty chair defense and submitted an associated proposed jury interrogatory. Therefore, the issue for analysis is narrowed to whether Catholic Charities proved,

by a preponderance of the evidence, the contributory fault of each nonparty at issue. *See e.g., State v. Ireland*, 2018-Ohio-4494, ¶ 1 (Generally, a defendant is required to prove an affirmative defense by a preponderance of the evidence.). To reiterate, the jury attributed fault in this case as follows: Caraballo, 2 percent; Catholic Charities, 8 percent; CCDCFS employees, 15 percent; MetroHealth providers, 11 percent; Christopher, 12 percent; and Larissa, 52 percent.

### 2. MetroHealth Medical Center's Employees and/or Independent Contractors

{¶ 147} The Estate makes several arguments under this assignment of error regarding whether Catholic Charities presented sufficient evidence regarding MetroHealth's employees and/or independent contractors' contributory fault: "[A]n entity cannot violate the Mandatory Reporter Statute which only imposes duties upon individuals"; Catholic Charities "never [pled] an affirmative defense alleging that any specific individual physician was liable for either a failure to report or for any medical negligence"; and Catholic Charities "never established through admissible proof that any specific non-party person had actually violated a duty owed that proximately caused [Jordan's] death."

{¶ 148} The Estate's first argument regarding apportioning fault to MetroHealth's providers is based on the notion that an "entity" is not a mandatory reporter of child abuse and neglect. We agree with the Estate's argument but find that it does not apply to the facts of this case. Without deciding this issue, our review of the record shows that the court instructed the jury to apportion fault to

"MetroHealth Medical Center's employees and/or independent contractors." The court did not instruct the jury to apportion fault to the entity "MetroHealth." We find this argument to be without merit.

{¶ 149} The Estate's second argument regarding apportioning fault to MetroHealth's providers concerns the details of pleading this defense. We find no law requiring Catholic Charities to name a "specific individual physician" in its affirmative defense pleadings. *See, e.g., Simpkins,* 2014-Ohio-3465 (holding that, pursuant to Civ.R. 8, the pleading of "an affirmative defense is generally adequate as long as the plaintiff receives fair notice of the defense"). We find this argument to be without merit.

{¶ 150} We turn to whether Catholic Charities proved, by a preponderance of the evidence, that a nonparty person, who was an employee or an independent contractor at MetroHealth, was negligent and that such negligence caused Jordan's death.

{¶ 151} One of Catholic Charities' expert witnesses, Dr. Lisa Pavlovic, testified that "if there's a suspicion of child abuse or [medical] neglect, . . . [m]edical providers . . . are mandated to report that." Dr. Pavlovic defined "medical neglect" as "the lack of seeking care when a child is obviously sick" or "a pattern of behavior of not following through with care." Dr. Pavlovic further explained that "from the beginning there were concerns with [Larissa] not following through or having — or not being engaged in Jordan's care." Dr. Pavlovic testified that the medical neglect was committed by Larissa and MetroHealth's negligence was in the failure to report

this pursuant to R.C. 2151.421. According to Dr. Pavlovic, "the medical care that Jordan received [at MetroHealth] was within the standard of care."

{¶ 152} According to Dr. Pavlovic, "there were multiple times throughout Jordan's care that there were opportunities to — for the providers to report medical neglect because there [were] various times that [Larissa] should have followed through with care for Jordan . . . ." Dr. Pavlovic testified that "the concern isn't that [Jordan] is missing well childcare, even though he did, and immunizations, even though he did. This is a child that had medical issues that weren't being addressed and followed up." Dr. Pavlovic testified that, according to Jordan's medical records, he was a "no-show" for numerous medical appointments in 2015, 2016 and 2017, and the last time he was seen by a medical professional was December 10, 2015.

{¶ 153} According to Dr. Pavlovic, "Doctor Carlin, the other pediatricians [and] the social workers" had a duty to "mandatorily report this . . . suspicion of medical neglect" to CCDCFS. Indeed, Dr. Pavlovic testified that "[t]here's a longstanding pattern of medical neglect" concerning Jordan.

{¶ 154} The doctor also testified about an "audit trail," which "lets us know every time somebody accesses someone's medical record." According to Dr. Pavlovic, Dr. Carlin accessed Jordan's medical records throughout 2015, 2016 and 2017. Dr. Mallic, Dr. Patel, Dr. Santos and Dr. Kumar, along with "a number of nurses," also accessed Jordan's medical records during this time frame.

{¶ 155} According to Dr. Pavlovic, these instances of Jordan not "presenting for medical care" are evidence of medical neglect and "if [the providers] were

concerned . . . that the child wasn't presenting to care, that should have prompted them to report to [CC]DCFS for concerns of medical neglect." Dr. Pavlovic summed up her opinion in her expert report as follows: "It is my opinion that reports of child medical neglect should have been made to [CC]DCFS on Jordan's behalf by any of the providers at MetroHealth involved in his care."

{¶ 156} On cross-examination, the Estate's attorney asked Dr. Pavlovic for the "specific names" of medical providers who should have reported Larissa's medical neglect concerning Jordan. Dr. Pavlovic responded, "Any of the providers that were involved in Jordan's care and were aware of the lack of follow through should have made a report." Dr. Pavlovic testified that she "didn't list any names specifically" in her expert report.

{¶ 157} The Estate offered the expert testimony of Dr. Robert Shapiro, who is board certified in child abuse pediatrics. In Dr. Shapiro's opinion, there was no evidence of medical neglect of Jordan presented at trial. Dr. Shapiro defined a "well-child visit" as a "scheduled visit at a particular interval . . . to make sure the child is growing well, has no life threatening conditions, is developing appropriately." According to Dr. Shapiro, whether a parent is compliant with bringing their children to "well-child" medical appointments is not up to the medical provider. "It's a parent's choice. . . . But it doesn't rise to the diagnosis of neglect." Dr. Shapiro reviewed Jordan's medical records and found that Larissa brought Jordan in for some of the "well-child" visits. The records further showed that Larissa brought Jordan in for medical appointments that concerned specific issues rather than just

"well-child" appointments. "She complied and she sought care when [Jordan] was ill." Dr. Shapiro further testified that nothing in Jordan's medical records "indicated or provided any concern of abuse or neglect . . . ."

{¶ 158} Dr. Shapiro established that the last time Jordan was seen at MetroHealth was on December 10, 2015. The colloquy continued:

Q: What would you expect out of MetroHealth if in 2016 they didn't have Jordan . . . come in for a well-child visit?

A: My expectation would be that they would have done nothing.

Q: And why would they do nothing if a well-child visit is not had for a child?

A: Well, MetroHealth providers would have given mother an appointment, and they might have sent mother a reminder perhaps. Some hospital offices would, some wouldn't.

But if she failed to show for the well-child visit, depending on hospital policies, they might have attempted again or not, but it would not have been a serious omission. It would not have been a life threatening follow-up visit and they had no reason to assume that mother was still in town or would have — in bringing her child back to MetroHealth for care.

{¶ 159} Dr. Shapiro further explained that MetroHealth would not have known if Jordan was receiving care at another hospital system or through a private healthcare office. Dr. Shapiro testified that, to a reasonable degree of medical certainty, he "did not see an opportunity or need for [MetroHealth] to report [Larissa] for medical neglect."

{¶ 160} Pursuant to R.C. 2151.421(A)(1)(a), mandatory reporting of child abuse or neglect arises when the mandatory reporter "knows, or has reasonable

cause to suspect based on facts that would cause a reasonable person in a similar position to suspect, that a child . . . has suffered or faces a threat of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child . . . ."

{¶ 161} The Estate argues that Catholic Charities did not prove MetroHealth employees or independent contractors were negligent because it did not identify a specific person who was an employee or independent contractor of MetroHealth. Our review of the record shows that Catholic Charities named at trial Dr. Carlin, Dr. Mallic, Dr. Patel, Dr. Santos and Dr. Kumar, along with "other nurses and social workers" to prove contributory fault for the purpose of apportionment. Indeed, not all of these doctors' first names were mentioned or identified at trial and no nurses or social workers were named during trial.

{¶ 162} Furthermore, Dr. Pavlovic, who is not affiliated with MetroHealth, testified that the doctors mentioned were all "providers" for MetroHealth. Catholic Charities did not present the testimony of any person who works at MetroHealth who could verify that these semi-anonymous healthcare providers were employees or independent contractors at MetroHealth. The only MetroHealth employee who testified established the authenticity of Jordan's medical records and stated that anyone who had electronic access to Jordan's medical file would have been a MetroHealth employee. There was no testimony that the doctors in question — Carlin, Mallic, Patel, Santos and Kumar — were or were not employees, agents or independent contractors of MetroHealth and, although "nurses" and "social

workers" were blamed by Catholic Charities, no nurses or social workers were identified.

{¶ 163} Our review of the record further shows that, before this case went to the jury, the Estate's attorney requested a jury instruction on this issue.

ESTATE'S ATTORNEY: In light of the ruling on the interrogatory as far as MetroHealth through its employees and independent contractors, plaintiff would ask for an additional jury instruction regarding repondeat superior just so that the jury actually has the information they need to be able to determine who is an employee and who's not.

THE COURT: What? No. We're going to deny that.

{¶ 164} Upon review, we find no case law directly on point with the facts of this case. Neither Catholic Charities nor the Estate cite law on appeal regarding whether Catholic Charities had to name names, so to speak, to succeed on an apportionment defense. Accordingly, we find that this very specific issue is one of first impressions in Ohio. If this failure to report medical neglect were part of a plaintiff's case-in-chief, it would be hard to imagine holding someone referred to as merely "Dr. Patel" or "other nurses and social workers" liable. Therefore, we find that Catholic Charities failed to prove by a preponderance of the evidence that an employee or independent contractor at MetroHealth failed to report medical neglect concerning Jordan. Accordingly, the trial court erred by instructing the jury to apportion fault to MetroHealth based on the evidence in the record.

### 3. Caraballo

{¶ 165} The Estate argues that the "trial judge never should have permitted separate apportionment to both Caraballo and Catholic Charities" pursuant to R.C. 2307.24(B). Catholic Charities, on the other hand, argues that "Caraballo's dismissal with prejudice did not extinguish the jury's ability to apportion fault to Caraballo pursuant to R.C. 2307.23(C)."

{¶ 166} R.C. 2307.24(B) states, in part, as follows: "For purposes of section 2307.22 of the Revised Code, a principal and agent, a master and servant, or other persons having a vicarious liability relationship shall constitute a single party when determining percentages of tortious conduct in a tort action in which vicarious liability is asserted."

{¶ 167} Because we determined that the court erred by granting a directed verdict and finding that vicarious liability did not apply to this case, we also conclude that the court erred by separating Caraballo's apportionment of damages from Catholic Charities' apportionment of damages. Pursuant to the plain language of R.C. 2307.24(B), Caraballo and Catholic Charities "shall constitute a single party" for the purpose of apportionment.

### 4. Larissa and Christopher

{¶ 168} The Estate argues that Larissa and Christopher's "collective wrongdoing could not be separated as a matter of law." To support this argument, the Estate cites *Hamlin v. Ohio Dept. of Rehab. & Corr.*, 2017-Ohio-8957 (Ct. of Claims). In *Hamlin*, a prisoner, Hamlin, was killed by another prisoner, Hensley.

*Id.* at ¶ 2. Hensley, who was serving a life sentence for four murders and was found guilty of attempted murder of four inmates while incarcerated, was known to be a violent and dangerous person. *Id.* at ¶ 17 and 18. Hamlin's estate sued the Ohio Department of Rehabilitation and Correction ("ODRC"), alleging that it "was negligent in failing to follow its security and privilege level review policies" by placing Hensley in "general population in a medium security prison . . ." and that this "negligence resulted in the death of . . . Hamlin." *Id.* at ¶ 3 and 68.

{¶ 169} ODRC argued in the trial court that the court should apportion liability to Hensley because he "was at least 90 percent culpable for Hamlin's death . . . ." *Id.* at ¶ 90. The trial court rejected ODRC's argument.

> The court finds ODRC's argument unpersuasive. ODRC's entire duty with respect to inmates under its custody and control is based upon it obligation to protect against foreseeable assaults from other inmates. Simply, violence against other inmates is the very thing ODRC is supposed to foresee and prevent. In this case, apportionment is contrary to this duty of care, and would effectively degrade or minimize ODRC's duty. As such, the court will not apportion damages in this case.

*Id.*

{¶ 170} Catholic Charities argues that "*Hamlin* is factually and legally inapplicable to this case" because, in *Hamlin*, ODRC had a duty to supervise Hensely, and in this case, Catholic Charities did not have a duty to supervise Larissa and Christopher. We agree with Catholic Charities. Additionally, we note that the trial court's decision in *Hamlin* was not appealed, and *Hamlin* has never been cited

in Ohio related to apportionment of damages. In other words, even though we find that it does not apply to this case, we are not bound to follow it.

{¶ 171} Upon review, we find no error in the apportionment of damages to Larissa and Christopher.

### 5. CCDCFS and its Employees

{¶ 172} The Estate argues that Catholic Charities did not present evidence regarding contributory fault of CCDCFS, particularly because the court ruled that no expert testimony regarding causation was admissible at trial. According to the Estate, "there was no testimony at all to even suggest that any breach [by CCDCFS] caused" Jordan's death. Catholic Charities argues that the Estate "completely ignores the testimony of [CCDCFS'] employees who admitted to the negligence of [CCDCFS'] employees, namely, David Seifert ['Seifert'], Denise Bell ['Bell'], and Angela McCord-Crump ['McCord-Crump']."

{¶ 173} Seifert testified that he works in the "agency hotline department" of CCDCFS, and he worked there at all times pertinent to this case. Seifert explained that he "take[s] phone calls regarding concerns of child abuse, neglect, [and] dependency." Seifert testified that he screens incoming calls reporting child abuse, neglect and dependency, and then he moves "it on to the next step, to the supervisor."

{¶ 174} Seifert testified that he took a call regarding Jordan's family on December 18, 2017. Seifert also testified that if he "received a call from someone identifying a child as skin and bones" he would consider it "a definite concern for

possible emergency." Seifert further testified that if there was a note in Jordan's file that Jordan "was with his dad," he would expect someone at CCDCFS to "confirm that Jordan was, in fact, with his dad . . . ." Asked if, because there is no follow-up note in Jordan's file confirming he was with his dad, "it's because [follow-up] didn't happen," Seifert answered, "It doesn't mean it didn't happen. It may mean it wasn't documented."

{¶ 175} In other words, Seifert offered no testimony regarding whether anyone at CCDCFS was negligent regarding Jordan's case.

{¶ 176} Bell testified that she worked at CCDCFS from 2003 to 2019 as a "social worker III" and a "child protection specialist." According to Bell, McCord-Crump was her supervisor on December 12, 2016. McCord-Crump assigned Bell to "the investigation into the Larissa Rodriguez family on December 12th, 2016 . . . ." Bell testified that part of her investigation included "reviewing the history" of the case, including "the information that was put in by the previous worker." Asked if she looked at the history "associated with the Larissa Rodriguez family" when assigned this case, Bell answered, "I believe I did." Asked about the details of that history, Bell responded, "I don't remember."

{¶ 177} According to Bell, she began to investigate the allegations on December 13, 2016, and, after several unsuccessful attempts to talk to Larissa, Bell went to Larissa's home on December 21, 2016. Bell also testified that a nurse at Fairview Hospital was the person who "made a call" to CCDCFS regarding Larissa's family.

{¶ 178} According to Bell, when she went to Larissa's house in the morning, "the school agers weren't home." Bell went back that same day in the afternoon and met with five children who were the "named children in the call from December 12th, 2016 . . ." because, as part of her job, she was "supposed to verify their well-being . . . ." Asked if she did this, Bell answered, "Yes."

{¶ 179} There was no mention of Jordan in Bell's notes regarding this investigation. According to Bell, she "believed" that Larissa told her "only five children lived in her home." Bell testified about notes in Larissa's file indicating that Larissa told CCDCFS that Jordan was with his dad. According to Bell, she was familiar with this note about Jordan, although she could not recall when she saw it.

{¶ 180} Bell admitted that she did not "lay eyes on" Jordan and, at the time, she did not look for Jordan, but that now she knows she should have. Bell went to Larissa's house again on January 27, 2017 and did not see or inquire about Jordan. Bell's paperwork from these two home visits indicate that "the home was clean and appropriate with working utility, adequate furnishing, and ample food supply." Bell saw no signs of abuse, found that the allegations were unsubstantiated and closed the case. Bell offered "family preservation services" to Larissa, but Larissa turned the offer down indicating that any help she needs, she gets from Caraballo.

{¶ 181} Our review of this testimony shows that the attorney for Catholic Charities repeatedly asked Bell if she should have verified Jordan's location during the investigation and Bell repeatedly testified that, knowing what she knows now, yes, she should have verified Jordan's location. Bell testified that, based on her

"observations in the home" and "everything . . . assessed" at trial, she could not say one way or another whether Jordan was living in Larissa's home in December 2016 and January 2017.

{¶ 182} McCord-Crump, who was a supervisor at CCDCFS until 2017, repeatedly testified that she did not recall the specifics of Jordan's case. After a careful review of McCord-Crump's testimony, we conclude that she did not testify that anyone at CCDCFS was negligent concerning Jordan's case.

{¶ 183} Our review of the testimony of Seifert, Bell and McCord-Crump shows that Catholic Charities elicited no testimony regarding causation, i.e., whether CCDCFS' alleged negligence caused, at least in part, Jordan's death. There is no evidence at all about what steps Bell or McCord-Crump could have taken if Bell, who was the CCDCFS employee investigating Larissa's family in December 2016, would or could have taken if she had seen an emaciated or abused Jordan in Larissa's home at that time.

{¶ 184} Accordingly, we find that Catholic Charities failed to show, by a preponderance of the evidence, CCDCFS's contributory fault in this case. Therefore, the trial court erred by apportioning damages to CCDCFS in this case.

{¶ 185} In summary, the court erred by apportioning damages to MetroHealth and its employees, Caraballo and CCDCFS and its employees and/or independent contractors. The error concerning Caraballo's apportionment is as a matter of law. The errors concerning MetroHealth and CCDCFS's apportionment

are because Catholic Charities failed to show, by a preponderance of the evidence, contributory fault.

{¶ 186} Accordingly, the Estate's third assignment of error is sustained in part and overruled in part.

### D. The Remaining Assignments of Error are Moot

{¶ 187} Pursuant to App.R. 12(A)(1)(c), the Estate's fifth and sixth assignments of error, which allege the improper admission of hearsay statements and "false allegations of criminal conduct," as well as the cumulative-error doctrine, are rendered moot by our ruling on the first four assignments of error.

## IV. Conclusion

{¶ 188} The trial court erred by refusing to acknowledge the CJE and ruling that it was inadmissible at trial. The trial court erred by granting Catholic Charities' motion for a directed verdict. The trial court erred by ruling that expert testimony regarding causation was inadmissible and speculative. The trial court erred, in part, in apportioning damages. The Estate's first and second assignments of error are sustained. The Estate's third and fourth assignments of error are sustained in part. The Estate's fifth and sixth assignments of error are rendered moot.

{¶ 189} Judgment reversed and case remanded for a new trial. In the interest of justice, as requested by the Estate and pursuant to Ohio Sup.R. 4.01 and 36.016, the administrative judge of the Cuyahoga County Common Pleas Court shall reassign this case to another trial judge.

It is ordered that appellant recover from appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

EILEEN T. GALLAGHER, J., and
MARY J. BOYLE, J., CONCUR